# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 24, 2008        Decided June 9, 2009

No. 07-3070

UNITED STATES OF AMERICA,
APPELLEE

v.

DUANE PHILLIP JONES, ALSO KNOWN AS CHICKEN JONES,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 06cr00273-01)

*Mary E. Davis*, appointed by the court, argued the cause and filed the briefs for appellant.

*Nicholas P. Coleman*, Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese III*, *Mary B. McCord*, and *Michael T. Ambrosino*, Assistant U.S. Attorneys.

Before: ROGERS, GARLAND, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: A jury convicted Duane Phillip Jones of gun and drug crimes. Jones contends that he is entitled to a new trial for two reasons. First, he argues that the district court erred in failing to suppress a statement he made at the time of his arrest. Second, he maintains that the government improperly disclosed inadmissible information to the jury. We find no error on either ground, and we therefore affirm Jones' convictions.

I

The facts surrounding Jones' arrest are not in dispute. The Superior Court of the District of Columbia issued a warrant for Jones on a charge of first-degree murder while armed, in connection with a homicide that took place on June 27, 2006. At a law enforcement briefing held on August 10, 2006, Deputy U.S. Marshal James Cyphers learned that the murder had been committed with a handgun; that Jones might possess two firearms because the victim's gun was taken during the murder; and that Jones had previous convictions for gun and drug offenses.

On the afternoon of August 10, Cyphers and approximately twenty other members of the U.S. Marshals Service Fugitive Task Force converged on the Clay Terrace area in northeast Washington, D.C., in search of Jones. Clay Terrace, which Cyphers characterized as "an open-air drug market" and "a very dangerous part of the city," was filled with people, some of whom fled when the marshals arrived. Mot. Hr'g Tr. 6-7, 20 (Jan. 16, 2007). As Cyphers got out of his vehicle, he made eye contact with Jones, who stood up and turned "frantic[ally]" in circles. *Id.* at 21. Jones then took off running, and Cyphers chased him for approximately 100 yards. During the chase, Cyphers heard a gunshot fired somewhere to his left. Jones eventually ran into the stairwell of an apartment building;

moments later, two small children emerged from the stairwell. Cyphers pursued Jones into the stairwell, which was semi-lit, and finally apprehended Jones there by grabbing him around the waist and pulling him to the ground. Jones, who was wearing a bulky jacket, landed on his stomach.

Within thirty seconds of apprehending Jones, and before administering *Miranda* warnings, Cyphers asked Jones whether he had "anything on" him. *Id.* at 12. Jones replied, "I have a burner in my waistband," which Cyphers understood to mean a gun. *Id.* at 13. Another deputy marshal then recovered a loaded firearm from Jones' waistband. Jones was handcuffed and escorted to a police car, where a third deputy marshal conducted a pat-down search and discovered a bag containing crack cocaine in Jones' back pocket.

On September 15, 2006, a grand jury indicted Jones on three counts: possession with intent to distribute five grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and unlawful possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Before trial, Jones moved to suppress his statement regarding the gun on the ground that it was obtained in contravention of the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966). After listening to Cyphers' testimony at the suppression hearing, the district court denied the motion to suppress, concluding that Jones' statement fell within the public safety exception to *Miranda*. *See New York v. Quarles*, 467 U.S. 649 (1984).

At trial, Cyphers and other deputy marshals testified about the circumstances surrounding Jones' arrest, including the statement Jones made about the gun. Jones did not testify or call any witnesses. On January 24, 2007, the jury convicted him on

all counts.  The district court sentenced Jones to a term of 135 months' incarceration on the first count, a consecutive term of 60 months' incarceration on the second count, and a concurrent term of 120 months' incarceration on the third count. Jones now raises two challenges to his convictions and also seeks a remand for resentencing under a retroactive amendment to the Sentencing Guidelines.

II

Jones' first contention is that the district court erred in denying his motion to suppress his statement concerning the gun.  Statements made in response to custodial interrogation are normally inadmissible unless preceded by *Miranda* warnings. *See Miranda*, 384 U.S. at 444-45.  In *New York v. Quarles*, however, the Supreme Court announced a "'public safety' exception" to the *Miranda* rule.  467 U.S. at 655-56.  In *Quarles*, police officers followed the defendant into a supermarket after a rape victim told them that her attacker had just entered the store carrying a gun.  When the defendant noticed one of the officers, he turned and ran toward the rear of the store.  The officer eventually caught the defendant, frisked him, and discovered that he was wearing an empty shoulder holster. After handcuffing the defendant, but before advising him of his rights, the officer asked him where the gun was, and the defendant responded, "the gun is over there."  *Id.* at 652.

Concluding that, "under the circumstances involved[,] . . . overriding considerations of public safety justif[ied] the officer's failure to provide *Miranda* warnings before he asked questions devoted to locating the abandoned weapon," the Court held the defendant's statement admissible at trial.  *Id.* at 651.  "[T]he need for answers to questions in a situation posing a threat to the public safety," the Court said, "outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege

5

against self-incrimination." *Id.* at 657. Hence, *Miranda* should not apply to situations "in which police officers ask questions reasonably prompted by a concern for the public safety," *id.* at 656, or for the safety of the arresting officers, *id.* at 658-59. In *Dickerson v. United States*, the Court confirmed that the public safety exception to *Miranda* is "as much a normal part of constitutional law as the original decision." 530 U.S. 428, 441 (2000).

To date, this circuit has had only one occasion to address the exception. In *United States v. Brown*, police officers who apprehended a defendant moments after he robbed a bank asked him about the location of the gun he had used during the robbery. 449 F.3d 154, 159 (D.C. Cir. 2006), *abrogated in part on other grounds by Dean v. United States*, 129 S. Ct. 1849 (2009). Although the officers had not read Brown his rights, we held that their "inquiries f[e]ll squarely within the public-safety exception to *Miranda v. Arizona*, recognized by the Supreme Court in *New York v. Quarles*." *Id.* (citations omitted).

Based on the totality of the circumstances that confronted Deputy Marshal Cyphers when he asked Jones whether he had "anything on" him, we conclude that Cyphers' question fell squarely within the public safety exception as well. *See United States v. Reyes*, 353 F.3d 148, 152 (2d Cir. 2003) (describing the public safety exception as "'a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case'" (quoting *United States v. Banks*, 540 U.S. 31, 36 (2003))). Before Cyphers entered the Clay Terrace area, he knew that Jones was wanted for murder while armed, that he could well be in possession of two firearms, and that he had previously been convicted of gun and drug offenses. Mot. Hr'g Tr. at 5-7. Cyphers testified that Clay Terrace was known as a dangerous drug market, and that "[f]irearms are used in the drug trade as

protection and coercion." *Id.* at 6. Indeed, the Marshals Service dispatched *twenty* marshals to arrest Jones specifically because of his criminal record, the severity of the crime for which he was sought, and the dangerous nature of the Clay Terrace area. *Id.* at 30. Moreover, once Cyphers made eye contact with Jones, several factors further heightened the threat to public safety: Jones led Cyphers on a chase in a crowded area; Cyphers heard a gunshot fired during the pursuit; the stairwell where Cyphers apprehended Jones was dimly lit; children had been present in the stairwell only moments earlier; Jones was wearing a bulky jacket that could conceal a weapon; and Cyphers had not yet been able to handcuff Jones when he asked whether Jones had anything on him.

We need not assess the weight of each of these individual factors, as in combination they clearly establish that Cyphers' question was "reasonably prompted by a concern for the public safety." *Quarles*, 467 U.S. at 656. Jones maintains that "no Court has gone so far as the district court did" in applying the public safety exception, Appellant's Br. 8, but that is plainly incorrect. Without necessarily endorsing them, we note that decisions in which other circuits have found the exception satisfied have emphasized the following factors, among others: the defendant's prior criminal record, *see United States v. Everman*, 528 F.3d 570, 572-73 (8th Cir. 2008); *United States v. Coleman*, No. 97-4078, 1999 WL 147262, at *2 (4th Cir. Mar. 18, 1999); the defendant's drug dealing, *see United States v. Estrada*, 430 F.3d 606, 613 (2d Cir. 2005); *United States v. Edwards*, 885 F.2d 377, 384 (7th Cir. 1989); the fact that the defendant was not yet handcuffed, *see Reyes*, 353 F.3d at 154; and the dangerous nature of the neighborhood where the defendant was arrested, *see United States v. Brady*, 819 F.2d 884, 888 (9th Cir. 1987). The instant case includes all of these factors, as well as the others noted in the preceding paragraph.

Jones raises two specific objections to the application of the public safety exception in this case. First, he argues that there was "no objectively reasonable need to protect either the public or the officer from immediate danger" because the murder for which he was wanted had taken place six weeks earlier, rendering it "not reasonable to believe that . . . Jones would still be in possession of both firearms." Appellant's Br. 10. We see nothing unreasonable about an officer worrying that a person who committed a murder just six weeks before, and who had a previous conviction for a firearm offense, would be in the habit of carrying a weapon. In any event, this is just one factor among the many that, in their totality, warrant a finding that the public safety exception applies here.

Second, Jones claims that Cyphers' question was "designed to elicit testimonial evidence" rather than to address safety concerns. *Id*. at 11. Jones bases this argument on Cyphers' testimony during the suppression hearing that he chose the words, "do you have anything on you?," because "[i]f you go into specifics, then they give you a specific answer. If you keep it general, then they usually tell you what they have." Mot. Hr'g Tr. at 12-13. But Jones' argument fails in light of the Supreme Court's instruction that "the availability of th[e] exception does not depend upon the motivation of the individual officers involved." *Quarles*, 467 U.S. at 656. As the Court explained, "[i]n a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception . . . should not be made to depend on *post hoc* findings at a suppression hearing concerning the subjective motivation of the arresting officer." *Id.* The Court recognized that "[u]ndoubtedly most police officers . . . would act out of a host of different, instinctive, and largely unverifiable motives -- their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect." *Id.* The

Court trusted that officers would "distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed *solely* to elicit testimonial evidence from a suspect." *Id.* at 658-59 (emphasis added). So do we.

Furthermore, Cyphers' question does not appear to have been crafted solely to obtain testimonial evidence. In fact, Cyphers made it clear that he phrased the question generally in order to elicit whether Jones had *any* weapon, rather than a specific weapon like a gun. Mot. Hr'g Tr. at 12-13 (testimony by Cyphers that his question was intended to find out whether Jones had "anything that can hurt me . . . anything at all"). As the Second Circuit has held, "a question need not be posed as narrowly as possible, because precision crafting cannot be expected in the circumstances of a tense and dangerous arrest." *Estrada*, 430 F.3d at 612 (internal quotation marks omitted); *see also United States v. Williams*, 181 F.3d 945, 954 n.13 (8th Cir. 1999). Moreover, Cyphers' actions bolster his testimony that his query related to safety concerns: he asked the question within 30 seconds of apprehending Jones, and he did not follow up with more questions. *See Quarles*, 467 U.S. at 659 (explaining that the officer clearly recognized the distinction between safety-related questions and investigatory questions because he had "asked only the question necessary to locate the missing gun before advising [the defendant] of his rights"); *Reyes*, 353 F.3d at 154-55 (noting the significance of the "arresting officer's disinclination to exploit the situation" by asking further questions); *United States v. Carrillo*, 16 F.3d 1046, 1050 (9th Cir. 1994) (emphasizing the officer's "deliberate refusal" to ask further questions).

Finally, Jones reminds us that "the public safety exception is just that -- an exception." Appellant's Br. 10. He is plainly correct about that. *See Quarles*, 467 U.S. at 658 (characterizing

the exception as "narrow"). We must therefore take care that the exception not be applied so routinely as to swallow the rule. *Cf. Estrada*, 430 F.3d at 613-14 (warning that the exception "must not 'be distorted into a *per se* rule as to questioning people in custody on narcotics charges,'" and emphasizing "that the exception will apply only where there are sufficient indicia supporting an objectively reasonable need to protect the police or the public from immediate harm" (quoting *Reyes*, 353 F.3d at 155)). But although *Quarles* was decided a quarter century ago, this is only the second time we have reviewed a case in which the government has relied on the public safety exception. Our decision today holds only that, based on the totality of the circumstances in this case, Cyphers' single question was "reasonably prompted by a concern for the public safety," *Quarles*, 467 U.S. at 656, and therefore fell within the exception.

## III

Jones' second contention is that he is entitled to a new trial because the government disclosed to the jury that he was arrested for murder. The district court had ruled that the nature of the charge upon which the warrant was based was inadmissible because its prejudicial effect outweighed its probative value. Jones maintains that, despite this ruling, the government showed the jury an unredacted Drug Enforcement Administration (DEA) form -- a "DEA-7" -- that specified that Jones was arrested pursuant to a homicide warrant. Jones concedes that the DEA-7 was not available to the jury during its deliberations, Oral Arg. Recording at 9:06-10, but he insists that the government inadvertently displayed it to the jurors on a projection screen for a few seconds during the testimony of a government witness.

The parties disagree on the standard that governs our review of this claim.  Jones argues that we must evaluate it under the harmless error standard.  The government, by contrast, contends that plain error review applies because Jones failed to object sufficiently at trial.  *See generally United States v. Coumaris*, 399 F.3d 343, 347 (D.C. Cir. 2005) (describing the differences between harmless and plain error review).

We need not resolve this dispute because Jones has not established that the jury ever saw the DEA-7.  Regardless of which standard of review applies, an appellant bears the initial burden of showing that the events allegedly constituting error did, in fact, occur.  *See, e.g.*, *Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1988) (explaining that a defendant who alleged that jurors engaged in unauthorized communications with third parties bore the burden of establishing "that an unauthorized contact was made"); *Anderson v. Acad. Sch. Dist.*, 122 Fed. Appx. 912, 914 (10th Cir. 2004) ("The appellant bears the burden of providing this court with the materials necessary to establish that error occurred in the district court."); *see also Sherman v. Smith*, 89 F.3d 1134, 1155 (4th Cir. 1996) (Motz, J., dissenting on other grounds) (observing that a defendant who claimed that a juror made an unauthorized visit to the crime scene "bore the initial burden of proving that the site visit occurred").  In most cases, the burden will be met easily and without explicit discussion because the transcript will reflect -- or the parties will not dispute -- what happened at trial.  But when, as here, a factual dispute exists, it is the appellant's burden to show that the events allegedly constituting error actually took place.

The DEA-7 is a one-page form that was included as part of a three-page document labeled "Government Exhibit 2A."  The three pages of Exhibit 2A were, in consecutive order:  (1) a DEA laboratory report analyzing the drugs; (2) photographs of the

analyzed drugs; and (3) the DEA-7.  R. Material for Appellee Tab A at 1-3.  A DEA-7 is a "report of drug property collected" by the police, *id.* at 3, and is filled out by the seizing officer for transmission to the DEA laboratory.  In this case, the DEA-7 contained the following statement:  "On August 10th 2006, members of the Metropolitan Police Department arrested the above named Defendant for HOMICIDE (Arrest Warrant #2006CRW001978)."  *Id.*  This reference to the homicide warrant appeared only on the DEA-7 and not on the other two pages of the exhibit.  *Id.* at 1-3.

Although the prosecutor used Exhibit 2A when questioning an expert witness and repeatedly described it as "the DEA-7," it is clear from the transcript that he used the term as shorthand to refer to the entire three-page document and only displayed the first page.  *See, e.g.*, Trial Tr. 387 (Jan. 23, 2007) ("Do you see on your monitor . . . the *front page* of the DEA-7?") (emphasis added).  This is also clear from the testimony of the witness, who described what he was seeing on the screen as a "certified report of controlled substance analysis," which was the laboratory report included as the first page of Exhibit 2A.  *Id.* at 388.  There is no evidence that the last page of the exhibit -- the DEA-7 itself -- was ever displayed to the jurors.

Jones' attorney did interrupt the testimony regarding Exhibit 2A and stated that the prosecutor "ha[d] the wrong *side* on there."  *Id.* (emphasis added).  The most natural reading of the attorney's comment is that the back side of the first page of Exhibit 2A -- the laboratory report analyzing the drugs -- was on the screen.  Had the DEA-7 itself been displayed, the attorney would have stated that the wrong *page* was on the monitor.  Indeed, the government clarified during a bench conference that the prosecutor "didn't use the '7'" when questioning the witness.  *Id.* at 389.  At the end of the conference, the court confirmed that "[w]hat we have on the screen is a laboratory report itself"

-- which, again, was the first page of Exhibit 2A. *Id.* And after the prosecution rested, the court stated there was no "need to worry about [Exhibit 2A] going back" with the jury because the DEA-7 indicating the arrest warrant charge was not "part of the evidence." *Id.* at 426-27.

At oral argument, Jones' appellate counsel stated that the transcript is "at best . . . confusing," and that it is "really not clear what was on the screen [in front of the jurors]." Oral Arg. Recording at 9:41-47. Even if counsel were correct, the most that can be said is that the issue is unclear, in which case Jones' appeal still falls short because he cannot satisfy his burden of showing that the act he describes as error actually occurred.

IV

After Jones was sentenced, the U.S. Sentencing Commission "lower[ed] the Sentencing Guidelines ranges for certain categories of offenses involving crack cocaine and permit[ted] district courts to apply the lower ranges retroactively." *United States v. Pettiford*, 517 F.3d 584, 594 (D.C. Cir. 2008) (citing Notice of Final Action Regarding Amendments to Policy Statement § 1B1.10, Effective March 3, 2008, 73 Fed. Reg. 217 (Jan. 2, 2008), and Notice of Submission to Congress of Amendments to the Sentencing Guidelines, 72 Fed. Reg. 28,558 (May 21, 2007)). Jones asks us to remand his case to the district court so that he can request a lower sentence based on the amended Guidelines. The government agrees that Jones may petition the district court for a reduced sentence, but it contends that "[t]he proper procedural mechanism" under these circumstances is for us simply to affirm and leave it to Jones to file a petition with the district court pursuant to 18 U.S.C. § 3582(c)(2). Appellee's Br. 30 n.25. That section provides:

> [I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 944(*o*), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(2).

Both Jones and the government agree that Jones will be entitled to ask the district court for a reduced sentence under § 3582(c)(2) regardless of which course we follow, and both agree that no collateral consequences will attend our decision. Oral Arg. Recording at 13:27-32, 24:53-25:12; *see also Pettiford*, 517 F.3d at 594.[1] Curiously, this dispute has occasioned a circuit split. Nearly all courts of appeals that have considered the issue have decided to remand to save the defendant the "additional step" of petitioning the district court for a sentencing modification. *United States v. Wales*, 977 F.2d 1323, 1328 n.3 (9th Cir. 1992); *see United States v. Ursery*, 109 F.3d 1129, 1137-38 (6th Cir. 1997); *United States v. Vazquez*, 53 F.3d 1216, 1227-28 (11th Cir. 1995); *United States v. Marcello*, 13 F.3d 752, 756 n.3 (3d Cir. 1994); *United States v. Coohey*, 11 F.3d 97, 101 & n.3 (8th Cir. 1993); *United States v. Connell*,

---

[1]In *Pettiford*, we declined a defendant's request to remand. 517 F.3d at 594. But we did so in that case because -- unlike here -- the effective date of the Guidelines amendment had not yet arrived, and the defendant therefore was not yet entitled to request a lower sentence.

960 F.2d 191, 197 n.10 (1st Cir. 1992). The Fourth Circuit, by contrast, has simply affirmed "without prejudice to [the defendant's] right to pursue . . . relief in the sentencing court" under § 3582(c)(2). *United States v. Brewer*, 520 F.3d 367, 373 (4th Cir. 2008). Other than the potential time savings, no circuit has articulated a substantive difference between these two options with respect to the relief available to a defendant.

We join the majority of our sister circuits and remand to give Jones an opportunity to request a reduced sentence. This course has a small advantage in terms of administrative efficiency, as it will put the issue in front of the sentencing court most directly and expeditiously. Whether to grant a reduction remains within the discretion of the district court. *See* 18 U.S.C. § 3582(c)(2) (providing that the court "*may* reduce the term of imprisonment" (emphasis added)); *Ursery*, 109 F.3d at 1137-38.

V

For the foregoing reasons, we affirm Jones' convictions and remand the case to the district court.

*Affirmed and remanded.*